NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LIANETTE MARIE RIVERA PARRA,

        **Plaintiff,**

v.                                                    **Case No. 6:17-cv-372-Orl-41KRS**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by
Plaintiff, Lianette Marie Rivera Parra, seeking review of the final decision of the Commissioner of
Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified
copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 8, 10, and the
parties' Joint Memorandum, Doc. No. 15.[1]

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an
agreed statement of the pertinent facts in the record.  Doc. No. 11.  Counsel for Plaintiff was ordered to identify and
frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for
the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling
Order.  *Id.* at 4.

NOT FOR PUBLICATION

## PROCEDURAL HISTORY.

In 2013, Rivera[2] filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, in which she alleged that she became disabled on August 1, 2013.   R. 228.   She also filed an application under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*, in which she alleged that she became disabled on July 31, 2013.   R. 233.

After her applications were denied originally and on reconsideration, Rivera asked for a hearing before an Administrative Law Judge ("ALJ").   R. 158.   An ALJ held a hearing on November 18, 2015.   Rivera, assisted by a Spanish language interpreter[3], and a vocational expert ("VE") testified at the hearing.   During the hearing, Rivera was represented by counsel.   R. 45-76.

After considering the hearing testimony and the evidence in the record, the ALJ found that Rivera was insured under OASDI through December 31, 2017.   The ALJ concluded that Rivera had not engaged in substantial gainful activity since the alleged disability onset date of August 1, 2013.   R. 24.

The ALJ found that Rivera had degenerative disc disease ("DDD") of the cervical spine, osteoarthritis and obesity, which were severe impairments.   *Id.*   The ALJ determined that Rivera's alleged thyroid gland disorder; carpal tunnel syndrome; diabetes mellitus; hypertension; fibromyalgia; anxiety disorder; and, affective disorder were not severe impairments.   R. 25.   The

---

[2] Plaintiff testified that she preferred being called Rivera.   R. 50.
[3] The ALJ found that Rivera could not communicate in English.   R. 36.

ALJ concluded that Rivera did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations.   R. 26.

The ALJ found that Rivera had the residual functional capacity ("RFC") to perform sedentary work, as follows:

> Specifically, she can operate hand controls, no more than frequently with her right hand and unlimited with her left.   She is limited to no more than frequent handling and fingering with her right hand and unlimited with her left.   The claimant can climb ramps and/or stairs frequently and ladders, ropes or scaffolds only occasionally.   She can perform all other postural activities frequently including balancing; stooping; kneeling; crouching and crawling.   The claimant is limited to performing simple, routine tasks and making simple work-related decisions.   In addition to normal breaks, the claimant would be off-task 5 percent of the time, in an 8-hour workday.

R. 26.   In reaching this conclusion, the ALJ gave some weight to the functional capacity assessment of James Shea, D.O., an examining physician. R. 35.   The ALJ also relied on the absence of treatment records showing limitations greater than those in the RFC assessment.   R. 34-35.

After considering the testimony of the VE, the ALJ concluded that Rivera could not return to her past relevant work as a cashier-checker or supervisor/cashier, both of which required a light level of exertion, and as a cash-accounting clerk or secretary, both of which were skilled jobs requiring a sedentary level of exertion.   R. 35.   The ALJ determined that there were other jobs available in the national economy that Rivera could perform, specifically table worker, document preparer and lens inserter, all of which were sedentary, unskilled jobs available in the national economy.   Therefore, the ALJ found that Rivera was not disabled.   R. 37.

Rivera requested review of the ALJ's decision by the Appeals Council.   R. 15.   On January 10, 2017, the Appeals Council found no reason to review the ALJ's decision.   R. 1.

3

Rivera now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Rivera having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Rivera's privacy to the extent possible.

Rivera was born in 1976.   R. 36.   She had a university degree in Business Administration with a concentration in communications.   R. 52.   She stopped working on August 1, 2013 because she was feeling bad.   She moved to Florida from Puerto Rico sometime that month.   R. 53.

At the ALJ's hearing, Rivera testified that she had physical therapy to try to reduce the pain in her hand, neck and back.   It provided relief for only one or two hours.   R. 57.   She estimated that she needed to change positions every thirty minutes.   She walked slowly due to pain in her back and hip.   R. 58.   Reaching with her arms caused pain in her neck.   R. 60.   She was unable to turn her head completely.   R. 61.   She could lift a gallon of liquid, but sometimes she dropped

things.  R. 60.  Medication made her sleepy.  R. 61-62.  She had difficulty with bathing and performing household chores due to pain.   R. 62, 65.

The medical records reflect that Rivera was treated at the Instituto de Salud Integral in May and July 2013.   Because these records are in Spanish, I cannot understand the findings.  R. 361-63, 365.   However, another physician, Rosimeri Clements, Psy.D., wrote that an examination by Dr. Carlos Gonzalez at Instituto de Salud Integral revealed a diagnosis of mood disorder due to a general medical condition and primary insomnia.  R. 380.   Rivera was treated with Prozac, among other medication.  R. 361.   Rivera also had physical therapy in July and August 2013.  R. 367-70.

In August and November 2013, Rivera was treated at Regency Endocrinology for diabetes. R. 384-88.

Lawrence Scalzo, D.O., examined Rivera at the request of the Division of Disability Determinations.   In a report dated September 6, 2013, Dr. Scalzo reported that he reviewed lab test results, imaging studies and documents from other providers, most if not all of which are not in the record.  R. 372-73.   Rivera's complaints included chronic pain in her back, hips, left shoulder and arm, and neck.  R. 373.   Dr. Scalzo observed that Rivera walked with a normal gait, but she could not perform tandem gait due to poor balance.   Rivera was comfortable in supine and sitting positions.   Upon examination, Dr. Scalzo observed pain, tenderness and numbness in the left shoulder.  R. 374.   He also observed tenderness in both hands, with reduced grip strength in the right hand.   He noted slight numbness in Rivera's left foot and large toe with some limitation in range of motion in joints of the left foot.   He did not observe tenderness or spasm in the spine, but there was hip joint tenderness.   Rivera's mental status, behavior and mood were good, although

5

her short term memory was reduced.   Dr. Scalzo's impressions were as follows:   chronic lumbar pain with history of disc herniation; chronic neck pain with history of disc herniations; history of cervical muscle spasms; straightened cervical lordosis; sacroiliac joint osteoarthosis; thyroid goiter; thoracic dextroscoliosis; history of fibromyalgia; left knee pain; right wrist pain; and, history of depression.   R. 375-76.   Dr. Scalzo wrote that Rivera was "able to stand for up to three hours in an eight hour day and frequent breaks are necessary at eight breaks of ten minutes each."   R. 377.

Starting in December 2013, Rivera had a course of physical therapy on referral from Gerald Farmer, M.D.   R. 405-43.   None of Dr. Farmer's treatment notes are in the record.   The physical therapy treatment records include the following medical diagnoses:   neck and back pain with numbness and tingling in both feet; bilateral carpal tunnel; and, fibromyalgia.   R. 405, 410.

On January 2, 2014, Mohit Jain, M.D., at Associated Family Medicine, treated Rivera. Upon examination, Dr. Jain observed normal motor strength in Rivera's upper and lower extremities.   R. 394.   His assessments included unspecified myalgia and myositis, hypothyroidism nonspecified, and lumbago.   He prescribed medication.   R. 395.

Gopal K. Basisht, M.D., a rheumatologist, examined Rivera on January 3, 2014 on referral from Dr. Jain.   Rivera reported that she had fallen down stairs five years earlier, and she was diagnosed with three herniated discs in her neck, three herniated discs in her lower back, bilateral carpal tunnel syndrome, and fibromyalgia.   She complained of pain with morning stiffness, intermittent swelling in her wrist and migraine headaches, among other symptoms.   R. 398.   Dr. Basisht reviewed imaging studies, most if not all of which are not in the record, as follows:

> MRI of the lumbar spine done on September 8, 2011 revealed multilevel
> spondylosis, degenerative disc disease significant at L1-L5 and L5-S1 and
> hemangioma in the L3 vertebral body. MRI of the cervical spine done on May l 7,
> 2012 revealed mild cervical spondylosis, degenerative disc disease at multiple levels

without any foraminal narrowing or facet arthropathy. MRI scan of cervical spine done on July 24, 2013 revealed significant disc herniations at C5-C6 and C6-C7 and perhaps to lesser extent at C3-C4. MRI of the lumbar spine on July 24, 2013 revealed no change compared to September 8, 2011 and significant findings were present at L4-L5, LS-S1, and L3-L4. Thyroid ultrasound done on June 26, 2012 revealed goiter with complex vascular nodules bilaterally. A needle biopsy of thyroid done on September 4, 2012 revealed changes consistent with benign follicular nodule (colloid nodule) with cystic changes. Nerve conduction study done on June 20, 2012 revealed median nerves distal latencies are prolonged consistent with carpal tunnel syndrome in the lower extremity increased insertional activity and compatible with bilateral C6-C7 radiculopathy. On July 13, 2011, she was noted to have bilateral C6 radiculopathy on nerve conduction study and she had normal study of the upper extremities and L5 radiculopathy. X-ray of the right knee done on July 11, 2012 revealed osteophyte in the intercondylar spine and patellar bone. X-ray of skull did not show any definite abnormality on July 11, 2012. Laboratory investigations done on July 11, 2013 revealed normal CBC, sedimentation rate 15 mm/hr, and BMP was normal. Thyroid function T4 low 0.73, TSH normal 1.320 mIU/mL, and free thyroxine was 0.73 ng/dL.

R. 399.  Dr. Basisht's assessments included polyarthralgia, cervical and lumbosacral spinal spondylosis and a history of bilateral carpal tunnel syndrome.  He recommended further tests and he advised Rivera to do meditation and range of motion and stretching exercises.  Rivera was scheduled to return to Dr. Basisht in one month, but there are no other treatment records from Dr. Basisht in the record.  *Id.*  However, Dr. Shea noted in his report that Dr. Basisht evaluated Rivera in December 2014.  R. 446.

On January 23, 2014, Glenn Bigsby, D.O., prepared a functional capacity assessment after review of Rivera's records.  He opined that Rivera could lift ten pounds frequently and stand or walk and sit about six hours in an eight-hour workday.  She would be limited to frequent pushing and/or pulling with her right arm due to decreased grip strength.  She could occasionally climb ladders/ropes/scaffolds and frequently perform other postural activities. She was limited to frequently handling and fingering with her right hand.  R. 112-15.

Rivera returned to Dr. Jain's practice in June 2014. She reported that she had been in a motor vehicle accident. She had sharp pain in her left foot, lumbar pain and lumbago. She was recovering from a left ankle sprain. Upon examination, Paul Boor observed tenderness to palpation in the lumbosacral spine with full range of motion, tenderness in the left foot, full range of motion in the neck and normal motor strength in the upper and lower extremities. He prescribed medication and ordered x-rays. R. 458-59.

In February 2014, Rivera sought treatment for low back and neck pain from Centra Care. R. 454. In April 2014, she returned to Centra Care for treatment of a sprained or strained foot. R. 456.

On November 13, 2014, Dr. Jain signed an Application for Disabled Personal Parking Permit indicating that Rivera needed it due to a severe limitation in her ability to walk due to an orthopedic condition. R. 252.

On August 22, 2015, Rivera was examined by Jasvendar S. Nandra, M.D., at Florida Family Physicians. Only a summary statement is in the record, rather than Dr. Nandra's treatment notes. R. 460-61. The summary statement reflects that Dr. Nandra referred Rivera to Alberto Mendez, an endocrinologist, Lakeside Behavioral Healthcare, a psychiatric facility, and to Dr. Basisht. R. 460. While there are also no records from Dr. Mendez in the record, there is a prescription from Lakeside Behavioral Healthcare (R. 466) but no treatment records from that facility.[4]

Dr. Shea evaluated Rivera on October 22, 2015. Rivera reported numbness and tingling in her hands and that she dropped things frequently. She had difficulty picking up objects from the

---

[4] On October 30, 2015, Rivera was examined by Felix Lopez, M.D., at Florida Family Physicians. There is only a summary statement in the record, rather than Dr. Lopez's treatment notes. R. 464-65.

floor and putting on shoes with laces.   She also had difficulty washing dishes, shaving her legs and walking up or down stairs.   Pain woke her up several times a night.   Activities such as prolonged standing, sitting, walking, bending at the waist and lifting heavy objects aggravated her pain.   R. 446.   Dr. Shea observed that Rivera had a normal posture and gait.   Upon examination, Dr. Shea found that Rivera had full muscle strength in her upper extremities.   He observed marked tenderness to palpation over the lumbar spine with reduced range of motion, and moderate tenderness in the cervical spine and trapezius muscles with reduced range of motion.   R. 448. Muscle testing in the lower extremities was normal except for a reduction in the left hamstrings, anterior tibialis and extensor hallucis muscles.   Rivera had decreased pinprick sensation at L1-S1. Dr. Shea's assessments were C5-6 and C6-7 disc herniations; L3-4, L4-5 and L5-S1 disc herniations; and bilateral L5 radiculopathy.   R. 449.

Dr. Shea prepared a Medical Assessment of Ability to do Work Related Activities (Physical) form.   He opined that Rivera could lift and/or carry up to five pounds occasionally and two pounds frequently.   She could stand/walk fifteen minutes at a time for a total of three hours per day. She could sit twenty minutes at a time for a total of two to three hours per day.   She could never perform postural activities.   She could not reach, handle, feel or push/pull.   She should not work at heights, around moving machinery or vibration, or in temperature extremes, humidity and on slippery surfaces.   R. 451-53.

During the hearing, the ALJ asked the VE to assume a hypothetical person of Rivera's age, education and past work experience.   This person could perform sedentary work with the limitations set forth in the ALJ's RFC assessment for Rivera.   The VE testified that this hypothetical person could not perform any of Rivera's past relevant work.   The person could

9

perform sedentary, unskilled jobs available in the national economy, specifically table worker, document preparer and lens inserter.   R. 68-70.   If the hypothetical person could sit and stand/walk up to a maximum of three hours total for each activity, the VE testified that there would be no full-time jobs in the economy that the person could perform.   R. 70.   If the person required one ten-minute break each hour, the VE testified that the person "would not be retained by an employer in any occupation."   R. 72.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Rivera asserts two assignments of error. She contends that the ALJ failed in his duty to fully develop the record.   She also argues that the ALJ misinterpreted Dr. Scalzo's functional capacity assessment.   She asks that the final decision of the Commissioner be reversed and that the case be remanded for further proceedings.   These are the only issues I will address.

### *Development of the Record.*

Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record.   This obligation exists even if the claimant is represented by counsel.   *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)(citations omitted).   Rivera correctly contends that the record does not contain treatment records for many of her healthcare providers and that some of the records from treatment providers that are in the record are incomplete.

Dr. Scalzo and Dr. Basisht's reports refer to missing records that they reviewed, including imaging studies from July 2013, shortly before the alleged disability onset date.   R. 372-73, 399. Neither the imaging studies nor the treatment notes of the professionals who ordered those tests

and, presumably, treated Rivera are in the record.   R. 399.   Other records obtained from treatment of Rivera by professionals in Puerto Rico which are in the record were not translated into English.

The record also shows that Rivera was examined by Gerald Farmer, M.D, and by treatment providers at Lakeside Behavioral Healthcare, but there are no treatment notes from these professionals.   Additionally, there are only summary sheets, but no treatment records, from Florida Family Physicians.   Records of other treatment providers also appear to be incomplete.   For example, the only record in the file from Dr. Basisht's practice is from January 4, 2014 but Dr. Shea noted in his report that Dr. Basisht evaluated Rivera in December 2014.   Similarly, the last record from Dr. Jain's practice group is dated June 2014, but Dr. Jain signed the Application for Disabled Person Parking Permit in November 2014.   The gaps between Dr. Jain's last treatment record and the Application for Disabled Person Parking Permit support a finding that the records of treatment by Dr. Jain are also not complete.

Counsel for the Commissioner correctly argues that "[i]n determining whether it is necessary to remand a case for development of the record, we consider 'whether the record reveals evidentiary gaps which result in unfairness [or] clear prejudice.'"   *Vesy v. Astrue*, 353 F. App'x 219, 224 (11th Cir. 2009)(quoting *Brown v. Shalala*, 44 F.3d 831, 935 (11th Cir. 1995)).[5]   The ALJ's decision reflects that he relied on the absence of records to support his conclusion that Rivera was not disabled.   Among other things, the ALJ included in his analysis the following findings:

- "Dr. Basisht stated that he reviewed MRIs; x-rays; US and NCS.   However, none of those objective records are in evidence."   R. 32

- "There is no evidence of emergent treatment or hospitalization secondary to a MVA

---

[5] Unpublished decisions of the Eleventh Circuit are cited herein as persuasive authority.

in June 2013."   *Id.*

- "There are no records in the file showing the claimant followed through with any tests or referrals ordered by Dr. Nandra."   R. 33.

- "The record does not contain any opinions, from treating physicians, indicating that the claimant is disabled, or even has limitations greater than those determined in this decision."   R. 34.

- "The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual."   R. 35.

- "The record shows the claimant failed to follow-up with referrals and tests ordered by her treating physicians."   *Id.*

- "She was given referral on several occasions but did not seek treatment from a mental health professional."   *Id.*

- "She failed to follow-up after urgent care and did not return for scheduled follow-up visits with treating physicians."   *Id.*

- "In sum, the above functional capacity assessment is supported by the routine, conservative nature of treatment received by the claimant, [and] her erratic, infrequent treatment . . . ."   *Id.*

If the record had been fully developed, treatment records may have undermined these conclusions.   For example, there is some evidence in the record that Rivera sought mental health treatment at Lakeside Behavioral Health, even though the records of that treatment are not in the record.   There are also indications that Rivera did follow-up with treating physicians even though the treatment records are missing.   For example, as discussed above, the last treatment note from

12

NOT FOR PUBLICATION

Dr. Jain's practice is dated June 2014 but Dr. Jain signed the Application for Disabled Person Parking Permit in November 2014.   The only record from Dr. Basisht is dated January 2014 but Dr. Shea wrote that Dr. Basisht evaluated Rivera in December 2014.   Therefore, the bases of the ALJ's decision may have been different if he was presented with a complete record.

When discussing whether remand should be ordered in a case of missing records, the United States Court of Appeals for the Eleventh Circuit wrote as follows:

> The lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits.   We have no way of knowing whether the evidence missing from this case would sustain Brown's contentions of her inability to work.   In the absence of proof to the contrary, however, we must assume that it does lend credence to her allegations. . . .   In view of the evidentiary gaps in the record, we find that Brown was not afforded a full and fair hearing and that she was prejudiced thereby.

*Brown*, 44 F.3d at 936.   Based on these findings, the Eleventh Circuit reversed the final decision of the Commissioner and remanded the case with instructions that it be returned to the SSA for further proceedings.

I recommend that the Court find that the rationale in *Brown* is equally applicable here.   The ALJ's substantial reliance on the absence of treatment records in light of the evidence that the administrative record was not fully and fairly developed establishes the Rivera was prejudiced. Therefore, the final decision of the Commissioner is due to be reversed and the case remanded for full development of the record and further proceedings based on a complete record.

### *Opinion of Dr. Scalzo.*

Rivera also contends that the ALJ misinterpreted the functional capacity assessment of Dr. Scalzo.   Dr. Scalzo wrote that Rivera was "able to stand for up to three hours in an eight hour day and frequent breaks are necessary at eight breaks of ten minutes each."   R. 377.   In his decision,

13

the ALJ described this finding as follows:   "[T]he claimant could stand for a total of three (3) hours, with a ten (10) minute break from standing every hour."   R. 30.   Counsel for Rivera argues that Dr. Scalzo did not tie the breaks only to standing.   Rather, he appears to read Dr. Scalzo's opinion to require that Rivera be given a ten-minute break every hour, including, for example, when she was sitting for the full hour.

If this reading of Dr. Scalzo's opinion is accepted, counsel for Rivera argues that Rivera could not perform work on a regular and continuing basis, that is eight hours a day, five days a week.   This argument is supported by the testimony of the VE that a person who required ten minute breaks every hour would not be retained by an employer in any occupation.

The ALJ stated that he gave some weight to Dr. Scalzo's opinion, but he did not explain what portion of the opinion he did not credit or why.   He also did not explain why he interpreted Dr. Scalzo to opine that Rivera would need one ten-minute break each hour only when she was standing.   Because the case requires remand for further development of the record, it would be appropriate for the ALJ on remand to state more specifically the reasons for his interpretation of Dr. Scalzo's opinion and why and to what extent he gave weight to only portions of Dr. Scalzo's opinion.   *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1178, 1179 (11th Cir. 2011)(requiring an ALJ to "state with particularity the weight given to different medical opinions and the reasons therefor").

## RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** and that the matter be **REMANDED** for further proceedings.

14

NOT FOR PUBLICATION

I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

**Notice.**

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

**Respectfully Recommended** this 7th day of February 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE